**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**NATIONAL WILDLIFE FEDERATION and**
**ARKANSAS WILDLIFE FEDERATION**                                             **PLAINTIFFS**

**V.**                                            **4:05CV001278WRW**

**FRANCIS J. HARVEY, in his official capacity**
**as Acting Secretary of the U.S. DEPARTMENT**
**OF THE ARMY and GALE NORTON, in her official**
**capacity as Secretary of the Department of the Interior**                  **DEFENDANTS**

<u>**ORDER**</u>

A Complaint[1] and Motion[2] were filed by Plaintiffs asking for an injunction to stop work

on the Grand Prairie Project ("GPP"), pending completion of a supplemental Environmental

Impact Statement ("EIS"), in accordance with the National Environmental Policy Act ("NEPA"),

and a formal consultation under the Endangered Species Act ("ESA").   Jurisdiction is asserted

under the Administrative Procedure Act (APA).[3]

Defendants, Francis J. Harvey and Gale Norton,[4] are sued in their official capacities as

Secretary of the Army and Secretary of the Department of the Interior.  Secretary Norton

delegated all responsibility on this issue to the United States Fish and Wildlife Service ("FWS"),

and Plaintiffs are specifically challenging the Army Corps of Engineers ("Corps").

---

[1]Doc. No. 1.

[2]Doc. No. 15.

[3]5 U.S.C. § 701.

[4]After the Complaint was filed, Gale Norton resigned as Secretary of the Interior.

**I. Introduction**

Completion of the Grand Prairie Project ("GPP") and the protection of the Ivory-billed Woodpecker ("IBW") are at the heart of this case.  The question is whether the two interests conflict; i.e., will completion of the Grand Prairie Project diminish the Ivory-billed Woodpecker's chance for survival?

Some doubt the existence of the IBW.  Often things in the natural world, as well as in other worlds, cannot be proved to a certainty.  And it may well be that doubts in this instance are justified, at least to some extent.  Here, however, the parties have stipulated that the IBW exists, so for purposes of this case, it does.

For the reasons set forth below, Plaintiff's Amended Motion for Preliminary Injunction based on alleged violations of the National Environmental Policy Act is DENIED.  Plaintiff's Amended Motion for Preliminary Injunction based on a likely violation of Section 7 of the Endangered Species Act is GRANTED.

**A. The Grand Prairie Project[5]**

The GPP is designed to prevent the depletion of the Alluvial and Sparta aquifers by pumping water from the White River and delivering it to some of the Grand Prairie farmland, by constructing a pumping station, and employing a system of canals, pipelines, and streams.  Based on the current rate of usage, it is estimated that the Alluvial aquifer will go dry, or nearly so,  in four to nine years.  Many scientist believe that, if the Alluvial aquifer drys up, it could contaminate the underlying Sparta aquifer.  Preservation of the Alluvial aquifer will benefit (perhaps save) the Sparta aquifer.  This aquifer flows under several states including Arkansas, Louisiana, Missouri, Tennessee, and Mississippi.  The potential depletion and destruction of the

---

[5]Plaintiffs' exhibits found at docket number 15 have been corrected in a later docket entry dated November 25, 2006.

aquifers is of great concern to economic and agricultural interests -- it is also an important environmental concern.

The pumping station for the GPP will be located next to the White River, northeast of DeValls Bluff, Arkansas.[6]  The GPP's pumping station, water withdrawal, and water delivery system will affect the Cache River Wildlife Refuge and the Wattenensaw Wildlife Management Area.[7] Importantly, the GPP's impact area will include the White River National Wildlife Refuge[8]-- home of the largest remaining bottomland ecosystem on any tributary of the Mississippi River. The area is renowned for its fish and wildlife, and is the last known North American refuge of the IBW.

**B.  The Ivory-billed Woodpecker**

The IBW is the largest woodpecker in the United States and the second largest in the world.[9] Before 2004, it was believed to be extinct. It was last seen in northeastern Louisiana in the 1940's.[10]   In April 2005, scientists confirmed that it was seen in the Cache River National Wildlife Refuge, and heard in the White River National Wildlife Refuge, several miles to the South.

The bird's moniker is "Lord God Bird," because, according to lore, it is so majestic that, when it was seen, people exclaimed, "Lord God!"  It is also known as the "Grail" bird, because, in the last 60 years, searching for it was akin to searching for the Holy Grail.

---

[6]Pl. Ex. E, Biological Assessment, p. 1,  Doc. No. 15-10.

[7]*Id.*(the largest stretch of pipeline extends along a ridge in the Wattensaw Wildlife Management Area).

[8]Pl. Ex., Map, plotted by Bradley Nunley, showing Corps' assessment of impact zone, Doc. Nos. 15-17 and 15-18.

[9]John Audubon painted the bird and included a detailed description of its habits in his famous book, *Birds of America*, published between 1827 and 1838.

[10]Pl. Ex., Biological Assessment, Doc. No. 15-10.

The IBW thrived in the once untouched forests that covered the southeastern United States -- in the delta of the Mississippi and Ohio Rivers.  It is a reclusive bird that prefers large expanses of bottomland swamp forest and extensive wilderness.[11]   As the forest began disappearing, so did the IBW.[12]

In order to thrive, the IBW must have uninhabited forest with old-growth trees and a continuous supply of newly dead trees.  A single breeding pair may need as much as seventeen square miles of forest bottomland.[13]  The IBW forages in trees greater than 11.8 inches in diameter, where they feed on beetles and beetle larvae in dead trees, and on ground dwelling insects.[14]  It is known to nest forty feet above ground in large dead trees or in dead portions of live trees.

It was sighted in February and filmed in April 2004, in the Cache River National Wildlife Reserve, north of Stuttgart, Arkansas and west of Carlisle, Arkansas, along Interstate 40.[15]  Sound recordings were made of the IBW in January 2005 in the White River National Wildlife Refuge, south of DeWitt, Arkansas in the lower White River Basin.[16]

---

[11]The IBW has a wingspan of 30-32 inches.

[12]See Def.  Ex. *Birds of North America Online*, Doc. No. 18 (A reduction in forest was not the only reason for the bird's disappearance.  Its feathers were popular in women's hats; it was widely hunted by native Americans; and  it was subjected to extensive collecting during the Victorian Era).

[13]Seventeen square miles equals 10,880.00 acres.

[14]Pl. Ex., Gosselink Decl., ¶ 10 (d) and (e), Doc.  No. 15-7.

[15] Pl. Exs. F and P, Doc. No.  15-10 and 12; Corps map plotted by Bradley Nunley, showing areas where the IBW was seen and heard, Doc. No. 15-17 and 18.

[16]*Id.*; As stated, no party has questioned the existence of the IBW.  Some ornithologist have questioned whether the bird in the film is an IBW or a Pileated Woodpecker--the latter is common in both the Cache and White River Refuges.  However, I have seen nothing that has questioned the authenticity of the sound recordings.

The costs of allowing an endangered species, such as the IBW, to become extinct are "incalculable."[17]

## II.  Background

In 1996, Congress authorized the Grand Prairie Region and Bayou Meto flood control project.[18]  The Corps, after years of studying plans for agricultural water supply, groundwater management, and conservation, issued a draft Environmental Impact Statement (EIS) in 1998. After public comment, the Corps issued the final EIS in 1999.  After a second round of public comment, the project was approved by a Record of Decision ("ROD") of the Corps which was signed  in February 2000.[19]

Four years later, the project was challenged by the Arkansas Wildlife Association, the National Wildlife Association, and other conservation groups.  A complaint was filed in February 2004, alleging violations of NEPA and requesting preliminary and permanent injunctions.

On March 4, 2004, the Corps issued a draft Environmental Assessment ("EA") that addressed changes to the original plan, primarily requiring the replacement of canals with pipelines.  A Finding of No Significant Impact ("FONSI") was issued by the Corps on July 2, 2004.  The final EA calculated that construction of the pump station, inlet channel, pipelines, canals, and the regulating reservoir would cause temporary effects to 60 acres, and permanent effects to 75 acres of upland hardwoods, bottomland hardwoods, and forested swamps.  In addition, the Corps conceded that the project would cause 11 acres of temporary and 30 acres of

[17]*T.V.A. v. Hill*, 437 U.S. 153, 194 (1978).

[18]*See* Water Resources Development Act of 1996, Pub. L. 104-303, § 363(a).

[19]Pl. Ex O, Record of Decision, Doc. No. 15-12 (Major General Phillip Anderson signed the ROD); *See also* Def. Ex., Walsh Declaration, ¶ 9, Doc.  17-11.

permanent destruction of the scrub/shrub swamp, and l acre of permanent destruction of marshland.[20]

A hearing on the Complaint was conducted in August 2004, and the District Court issued its opinion in November 2004.[21]  The Court found that "the Grand Prairie Project will not adversely impact the White River or its Basin."[22] The District Court noted that "[t]he minimum flow requirements set forth a minimum level of water depth for the White River sufficient to sustain navigation, fisheries, and wetlands."[23]   The Court emphasized that the minimum flow requirement will protect the White River and its ecosystem because, if the River were to drop below a certain level, no more water could be pumped out.  The Court concluded:

> The Court has extensively reviewed the FEIS [Final Environmental Impact Statement]. . . .Based on this review, the Court concludes that the Corps complied with the NEPA and the CEQ regulations in its evaluation of the direct and indirect environmental impacts of the project, and, in particular, the Corps' study of the impact of the project upon the wetlands and bottomland hardwoods of the White River Basin.[24]

The Eighth Circuit affirmed this decision.[25]

After the District Court's ruling, the Corps began the first phase of the GPP -- construction of the six-unit pumping station.  A contract was awarded and construction was

---

[20]Pl. Ex. J, June 8, 2005 Concurrence Letter,  Doc. 15-10.

[21]*Arkansas Wildlife Federation, et al. v. U.S. Corps of Engineers, et al.*, (4:04CV133)(GTE), *aff'd* 415 F.3d 1096 (8th Cir.  2005).

[22]*Id.* at 51-52.

[23]*Id.*

[24]*Id.* at  53.

[25]*Arkansas Wildlife Federation,* 431 F.3d 1096.

authorized to begin in April 2005.  However, remarkable new information emerged that would cause another challenge to the GPP.

On April 28, 2005, the FWS announced the rediscovery of the IBW.[26]  After this, the Corps suspended construction.[27]  Beginning in May 2005, the Corps evaluated the effects of the GPP on the IBW and issued a Biological Assessment on May 24, 2005.  In its assessment, the Corps concluded that the GPP is not likely to adversely affect this Woodpecker.[28]

Before entering a formal concurrence, the FWS issued a letter telling the Corps that it had to meet specific requirements.[29]  This letter required the Corps to conduct pre-construction surveys for IBW habitat, delay construction if the habitat is within one mile of the construction site, and adopt long-term monitoring of water withdrawals.[30] Water flow monitoring was required because, even with the minimum flow cutoff, the projects's operation will alter water levels in the area -- making some forested wetlands slightly drier-- and affecting the "flood plain resources."[31]  After notification of the Corps' Biological Assessment,  and the FWS's letter of concurrence issued June 8, 2005, Plaintiffs initiated the present action on September 8, 2005.

---

[26]Def. Ex., Walsh Decl., ¶ 11, Doc. No. 17-11.

[27]Def. Ex., Norman Decl., ¶ 8, Doc. No. 17-3.

[28]Pl. Ex.  E, Biological Assessment, Doc.  No.  15-10.

[29]Pl. Ex.  J, Doc. 15-10.

[30]Pl. Ex. E, Biological Assessment, Doc.  No. 15-10.

[31]Pl. Ex. J, June 8, 2005 Concurrence Letter, Doc. No. 15-10.

Plaintiffs filed a complaint, alleging that the FWS violated the ESA,[32] the APA,[33] and that the Corps violated NEPA.[34] An Amended Complaint was filed incorporating the allegations of the first Complaint and added the contention that the Corps violated the ESA and the APA.[35]

According to Plaintiffs, the Corps and the FWS arbitrarily concluded that the GPP would not adversely affect the IBW.  They allege that jeopardy is likely because: (1) the Corps will destroy 135 acres of forest without ruling out the possibility that it may include the bird's nesting, roosting, and foraging trees; (2)  the GPP will draw down one hundred fifty eight (158) billion gallons of water each year from the White River, and this will significantly reduce the water levels in the wetland forests; (3) some tree species will die when water levels fall, and the forest will gradually decline; (4) the FWS never revealed which trees would be most threatened by the change in water level; (5) the Corps is rushing to construct a massive pumping station located fourteen miles away from the IBW sighting; (6) the canals and pipelines will fragment the bottomland forest, which may adversely affect IBW habitat; and (7) the noise and human activity involved in construction and pumping activity will adversely affect the IBW.  Plaintiffs point out that there is very little known about the IBW, and more study is necessary before beginning such a large, irreversible commitment of federal resources.

A hearing was held in this case on February 6, 2006.  Since that hearing, Defendants filed a Notice of Completion of Endangered Species Act Section 7 Consultation.[36]  The Corps and the

---

[32]16 U.S.C. § 1536(a)(2).

[33]5 U.S.C. § 706(2)(A).

[34]42 U.S.C. § 4332(C)(2).

[35]Doc. No. 23.

[36]Doc. No. 40.

FWS agreed to habitat surveys, long-term botanical and hydrologic monitoring, and  an "adaptive management" plan.[37]

Defendants acknowledge that final action under the Informal Consultation process is now complete, but they challenge jurisdiction based on lack of final agency action, and this is still pending.  Jurisdictional issues such as standing and ripeness are determined at the time the lawsuit is filed.[38]   The controlling date here is September 8, 2005.

### III.  Standing and Ripeness

The APA requires review of agency action, but only if the action is final.[39] An administrative action is final if it marks the consummation of the agency's decision-making process and it "determines rights or obligations from which legal consequences will flow."[40] "The finality doctrine [concerns] whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury."[41]

The FWS issued a conditional concurrence letter on June 8, 2005,[42] agreeing that the GPP would not likely have an adverse affect on the IBW.  This letter allowed additional construction and represented an "irreversible commitment of resources." An irreversible commitment of funds is forbidden by the ESA until there is a final agency determination.[43]

---

[37]*Id.*

[38]*McClain v.  Am.  Econ.  Ins.  Co.*, 424 F.3d 728, 733 (8th Cir. 2005).

[39]5 U.S.C. §§ 702 and 704.

[40]*Bennett v.  Spear*, 520 U.S. 154, 178-79 (1997).

[41]*Industrial Customers Northwest Utilities v. Bonneville Power*, 408 F.3d 638, 645 (9th Cir. 2005).

[42]Pl. Ex.  J, June 8, 2005  Concurrence Letter, Doc. No. 15-10.

[43]16 U.S.C. § 1536.

On June 24, 2005, the Corps sent a follow-up letter agreeing to the FWS's conditions.[44]

The original Complaint, alleging violations of NEPA and the ESA, was filed after the Corps and

FWS reached this agreement.

The FWS letter of June 8, 2005, meets the two part test for finality.  First,  it takes a

definitive position by concurring with the "no adverse effect" finding.  Second, it creates

circumstances from which legal consequences may flow by allowing an irreversable

commitment of federal funds.  At the time the Complaint was filed, the issues were ripe for

judicial review under the APA; therefore,  Plaintiffs have standing, and Defendants' challenge to

the Court's subject-matter jurisdiction fails.

**IV.  Discussion**

    **A.  NEPA**

        **1.  Requirements of NEPA**

While NEPA does not require results, it does prescribe a necessary process.[45] The process

required by NEPA is preparation of an EIS or a supplemental EIS.  As long as adverse

environmental effects are adequately identified and evaluated by the EIS, the agency complies

with NEPA, even if it decides that other values outweigh environmental risks.[46]

---

[44]Pl. Ex. T, Corps' June 24, 2005 letter to FWS, Doc. No.15-12.

[45]*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 335 (1989); *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-228 (1980) (*per curiam*); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc*., 435 U.S. 519, 558 (1978).

[46]*Strycker's Bay Neighborhood Council, Inc.*, 444 U.S. at 227-228.

Some statutes impose substantive environmental obligations on federal agencies,[47] but NEPA prohibits uninformed, not unwise, agency action.[48]  The EIS must describe the environmental consequences of agency action -- nothing more.[49]

Adequate agency consideration is shown by an EIS's form, content, and preparation.[50]  It must include a detailed statement on the following:   (1) the environmental impact of the proposed action; (2) adverse effects that cannot be avoided; (3) alternative, less intrusive action; (4) the relationship between local short term gain and universal long term benefit; and (5) irreversible commitment of resources to the proposed action.[51]  When reviewing an EIS, courts simply ensure that the agency adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.[52]

Often an initial EIS is sufficient, but sometimes an EIS must be supplemented.[53] The Council on Environmental Quality implements NEPA regulations, which require agency supplementation when there are "*significant* new circumstances or information relevant to

---

[47]*Robertson*, 490 U.S. 351, n.14 (the Supreme Court holds that the Endangered Species Act creates substantive rights).

[48]*Id.* at 351.

[49]42 U.S.C. § 4332(2)(C).

[50]*Association of Pub. Agency Customers v. Bonneville Power Admin*., 126 F.3d 1158, 1183 (9th Cir. 1997).

[51]42 U.S.C. § 4332 (2)(C); *Department of Transportation v. Public Citizen,* 541 U.S.752, (2004).

[52]*Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1151, 1128 (8th Cir. 1999) (*quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978)).

[53]*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370-374 (1989); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).

environmental concerns."[54]   These regulations are to be given great deference by federal

courts.[55]

In *Marsh*, the Supreme Court considered NEPA when new information emerged, and

held that an agency must take a "hard look" at new information to determine if supplementation

is necessary.[56]  The Court explained that an agency must apply a rule of reason and prepare a

supplemental EIS: (1) when a major federal project is pending; (2) the new information

significantly affects environmental quality; or (3) the environment is affected to an extent not

already considered.[57]  Courts should carefully review the record to determine that the agency

made a reasoned decision based on its evaluation of the significance of the new information.[58]

Of course,  when preparation of an EIS would serve no purpose under NEPA's regulatory

scheme, it is not reasonable to require the agency to prepare an EIS.[59]

Applying these directions, the Corps and the FWS are required to:  (1) take a "hard look"

at the rediscovery of the IBW; (2) consider its significance to the environment; (3)decide on

reasonable grounds if completion and operation of the project will have a substantial effect on

the IBW; and (4) determine if the IBW is a species that is so unique compared to other area

wildlife, that effects on its recovery and survival were not considered when the project was first

conceived.

---

[54]40 C.F.R.  § 1502.9(c)(1)(ii) (2003) (emphasis added); *See also* 40 C.F.R. § 1502.9(c) (requiring supplementation when significant impact information arises).

[55]*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 335 (1989).

[56]*Marsh,* 490 U.S. at 385.

[57]*Id.* at 374.

[58]*Id.* at 360 and 378.

[59]*Department of Transportation v. Public Citizen*, 541 U.S. at 767-8 (*citing Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289, 325 (1975); 40 C.F.R. §§ 1500.1 (b)-(c) (2003)).

## 2.  Standards of Review under the APA

The APA sets forth the standard of review for NEPA requirements.[60]  Under the APA, an

agency administrative decision may be set aside only if it is "arbitrary, capricious, and an abuse

of discretion, or otherwise not in accordance with law;"[61] "in excess of statutory authority;"[62] or

"without observance of procedure required by law."[63] A decision is arbitrary or capricious if the

agency relied on factors forbidden by Congress, did not consider an important aspect of the

problem, and offered an explanation that is implausible or contrary to the evidence.[64]  Deference

is given  to an agency's choice of methodology so long as it has a proper foundation. The agency

must provide a satisfactory explanation for its actions based on relevant data,[65] and courts look

for clear errors of judgment.[66] Unless it is shown that the Corps and FWS blocked out informed

opinion and overextended their reach, their judgment should be accepted.

On the other hand, despite this highly deferential standard of review, courts shouldn't

rubber-stamp administrative decisions that are inconsistent with statutory purpose or  frustrate

congressional policy.[67]  But, if an agency's decision is supported by any rational basis, it must be

---

[60]5 U.S.C. § 706; *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation*, 340 F.3d 749, 755 (8th Cir. 2003) (Unless expressly stated otherwise, judicial review of a federal agency decision is governed by the APA).

[61]5 U.S.C. § 706(2)(A).

[62]*Id.* at § 706(2)(C).

[63]*Id.* at § 706(2)(D).

[64]*Motor Vehicle Manufacturers Association v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

[65]*Niobrara River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004).

[66]*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

[67]*Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 291 (1965).

upheld.[68] Even if the agency uses flawed data, its decision will be set aside only if "there is a significant chance that, but for the errors, the agency might have reached a different result."[69]

### 3.  Injunctive Relief under NEPA

There is no statutory authority for injunctive relief under NEPA; therefore, any request for a preliminary injunction is governed by Fed. R. Civ. P. 65 and traditional equitable doctrine. Plaintiffs must show: (1) the threat of irreparable harm; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability of success on the merits; and (4) the public interest.[70]  The standard for a permanent injunction is essentially the same as for a preliminary injunction, except Plaintiffs must show actual success on the merits for a permanent injunction.[71]

### 4.  Analysis

The impact of the GPP on the White River, its wetlands, and bottomland forest was addressed by the earlier decision.[72] The Court found that the "stop-pump" provision described in the original EIS adequately addressed potential environmental damage to the area.

Once the IBW was discovered, the Corps evaluated the possible impact to particular areas of the forest considered most suitable to the IBW.  An interagency team of the FWS, the Arkansas Game and Fish Commission ("ACFC"), and the Corps participated in  field surveys and examined forest areas that would be disturbed by the canals, pipelines, and the pump station.

---

[68]*S.W. Bell Tel. Co. v. Fed. Comm. Comm'n*, 153 F.3d 523, 554 (8th Cir. 1998).

[69]*Century South Dakota Co-op. Grazing District v. Secretary  of the United States Department of Agriculture*, 266 F.3d 889, 899 (8th Cir. 2001).

[70]*Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (1981).

[71]*Seigel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir.  2000).

[72]*Arkansas Wildlife Federation, et al. v. U.S. Corps of Engineers, et al.* (4:04CV133 GTE).

During their surveys, the interagency team identified the species and age of trees closest to construction sites and did not find trees typically used by the IBW for nesting, roosting, and foraging. The Corps designed the right-of-way of some pipelines to minimize detrimental effects to mature forest and moved the location of the pump station to avoid destruction of old-growth trees.[73]  After the survey, the Corps concluded that there would be no significant effect because: (1) there were no sightings of the IBW in the project zone; (2) the bottomland hardwoods and wetlands were not seriously threatened by the water withdrawal; and (3) the project would only involve destruction of 135 acres of trees in an area consisting of 263,662 acres of forest and wetlands.  For the most part, the FWS agreed with the Corps' conclusions but suggested some additional preventative measures.

The FWS conceded that the "stop-pump" provision may not completely offset water reduction and its effects to "flood plain resources."[74]  To address those concerns, the FWS insisted on long-term water-flow monitoring.  The FWS also called for pre-construction surveys of any trees suitable for IBW habitat within a one-mile radius.  The Corps agreed to the recommendations, and both agencies finalized their accord.[75]

Applying NEPA directives under the APA standard of review -- the Corps and the FWS did not act arbitrarily or capriciously.   NEPA requires action where the adverse effects on the environment are *significant*.[76]

---

[73]Pl. Ex. E, at 6, Biological Assessment, Doc. No. 15.

[74]Pl.  Ex. J, June 8, 2005 Concurrence Letter, Doc. No. 15-10.

[75]Doc. No. 40.

[76]*Marsh,* 490 U.S. at 385 (emphasis added).

The Corps based its opinions on scientific observations of IBW habitat recorded by Hoyt in 1905, Tanner in the 1930s and 1940s, and Dennis in 1948.[77]  It then examined the effect of the GPP on trees preferred for nesting, roosting, and foraging. By studying the specific habitat of the IBW, the Corps and the FWS took a "hard look" at the rediscovery of the IBW; considered what is known about its habitat; reasonably evaluated the sites of the pumping station, and the largest pipeline; took steps to ensure that the water flow would be controlled to benefit the bottomland forest; and committed to pre-construction surveys to prevent habitat destruction.

In view of the highly deferential APA standard of review, Defendants conformed to NEPA directives. The FWS's conclusion that environmental effects on the IBW would not be significant enough to warrant a supplemental EIS complies with NEPA.

Under standards for injunctive relief outlined above, Plaintiffs did not show a likelihood of success on the merits.   The request for preliminary injunctive relief under NEPA is DENIED.

**B.  The Endangered Species Act**

### 1.  Substantive and Procedural requirements of the Act

The Supreme Court characterized the Endangered Species Act ("ESA") as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[78]  The purpose of the ESA is "to provide a  means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."[79]  The plain intent of Congress by enacting the ESA was to halt and reverse extinction of endangered species

---

[77]Pl.  Ex.  E, Biological Assessment, at  4, Doc. No. 15-10.

[78]*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978) (In one of the most celebrated environmental decisions, the Supreme Court approved an injunction against the operation of a dam constructed by the Tennessee Valley Authority which would have destroyed the habitat of a small fish known as the snail darter).

[79]16 U.S.C. § 1531(b).

"whatever the costs."[80] Congress declared that "all [f]ederal . . . agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities [to further] the purposes of this [Act]."[81] Unlike NEPA, the ESA imposes substantial, continuing, and affirmative obligations on federal agencies.[82]

The Act empowers the Secretary of Commerce to recommend: (1) when a species should be listed as endangered; and (2) what habitat should be listed as a critical.[83]  It is up to the Secretary of the Interior to implement these recommendations through regulations.[84]  After a species is identified as endangered, the Interior Secretary is to develop plans for its survival.[85]

The IBW was one of the first species listed as endangered under the ESA.[86]  Very little is known about its numbers, preferences and habitat; therefore, no critical habitat has been identified and designated.

The mavens of the law and regulations pertaining to the Endangered Species Act refer to the heart of the Act as "Section 7."[87]  It sets out requirements for all federal agencies to ensure

---

[80]*T.V.A. v. Hill*, 437 U.S. at 157.

[81]16 U.S.C. § 1531(c)(1).

[82]*Sierra Club v. Lyng*, 694 F. Supp. 1260, 1270 (E.D. Tex. 1988); *Defenders of Wildlife v. Administrator, E.P.A.,* 882 F.2d 1294 (8th Cir. 1989).

[83]*See* 16 U.S.C. § 1533(a)(2)(A).

[84]*See* 16 U.S.C. § 1533(a)(3)(A).

[85]*See* 16 U.S.C. § 1533(f).

[86]The IBW was listed as endangered on March 11, 1967 (32 F.R. 4001) and June 2, 1970 (35 FR 8495); *see* 50 C.F.R. § 17.11 (amended by 71 F.R. 19244-01 and 71 FR 19452-01).

[87]16 U.S .C. § 1536 (Although there is no "Section Seven" in this statute).

that any action they authorize, fund, or carry out is not likely to jeopardize a listed species or adversely modify its critical habitat.[88]

The word "jeopardize" is defined in the federal regulations.  An agency will "jeopardize an endangered species if it reasonably would be expected, directly or *indirectly*, to reduce appreciably the likelihood of both the survival and *recovery* of a listed species . . . by reducing the reproduction, numbers, or distribution."[89]   After reviewing the ESA, the District Court in *Bensman v. U. S. Forest Service*,[90] concluded that agencies have an absolute duty to identify the habitat of an endangered species before making a determination that a species is not likely to be adversely affected or jeopardized.

The ESA requires a procedural consultation when an agency proposes an action that *may* affect an endangered species.[91]  As part of this process, an agency must use the best scientific and commercial data available, and consult with the FWS, if it has reason to believe that an endangered species may be present in the area of a proposed action.[92]  The ESA states: "each Federal agency *shall* request . . . information that verifies whether any [listed] species may be present in the area of . . . agency action."[93]

---

[88]*State of Idaho By and Through Idaho Public Utilities Commission v. I.C.C.*, 35 F.3d 585 ( D.C. Cir. 1994); 16 U.S.C. § 1536(a)(2).

[89]50 C.F.R. § 402.02 (emphasis added).

[90]984 F. Supp. 1242 (W.D. Mo.  1997).

[91]*See* 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a) (emphasis added).

[92]16 U.S.C. § 1536(a)(3) and 16 U.S.C. § 1536(c)(1).

[93]16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).

The regulations define "action area" as an area that is affected directly or indirectly.[94] During consultation, federal agencies must comprehensively measure a project's scope -- not just the "immediate area involved."[95]

An incremental approach is used  to determine the project's impact on a listed species -- (1) the presence of a species is established; (2) potential effects on the species are identified; (3) adverse effects are singled out; and (3) whether a  species will be jeopardized by the adverse affects is evaluated.[96] The regulations provide several different avenues for making such determinations: Biological Assessment, Informal Consultation, and Formal Consultation.

A Biological Assessment is a study prepared under the direction of the FWS, that evaluates the potential effects of the project on an endangered species.[97] Such an assessment is to be performed when a major construction project is about to take place. The assessment must be completed before the project begins.[98]

 An important first step in a Biological Assessment is determining whether a listed species may be present in the project area.[99]  Before beginning construction, an agency must submit either a written request to the Director of the FWS asking for a list of endangered species present in the action area, or written notification that an endangered species is in the area.[100]  The Director is required to respond within 30 days and either provide the requested list, or agree with

---

[94]50 C.F.R. § 402.02.

[95]50 C.F.R. § 402.02.

[96]50 C.F.R. § 402.14.

[97]*Id.*

[98]50 C.F.R. § 402.12.

[99]16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12(c).

[100]50 C.F.R. § 402.12.

the agency's notification.[101]  The Director also "may recommend discretionary studies or surveys [to] provide a better information base for the preparation of an assessment."[102]

The recommended content of a Biological Assessment includes an "on-site inspection of the area affected by the action to determine if listed . . . species are present or occur seasonally."[103]  The FWS handbook has this same recommendation.[104]

 If the species may be there, the agency must prepare an evaluation of the project's "potential effects" on the species and decide whether a species is likely to be adversely affected.[105]  If the Biological Assessment concludes that the proposed action "is not likely to adversely affect" a listed species, and the FWS concurs in writing, the project may go forward.[106]  Otherwise, the agency must request Formal Consultation.[107]

An Informal Consultation is a process that includes all discussions and correspondence between the FWS and the action agency that take place before a Formal Consultation is necessary.[108]  Like the Biological Assessment process, if, during informal consultation, the agency finds no adverse effect, and the FWS concurs, consultation is terminated.  If it appears

---

[101]50 C.F.R. § 402.12 (c) and (d).

[102]50 C.F.R. § 402.12 (d).

[103]50 C.F.R. § 402.12 (f)(1).

[104]Pl.  Ex.  R, *Endangered Species Consultation Handbook*,  Doc. No. 15-24.

[105]50 C.F.R. § 402.12(a).

[106]50 C.F.R. § 402.12(k).

[107]*Id.*

[108]*Id.*

that an endangered species is likely to be affected by the project, then Formal Consultation is required.[109]

Formal Consultation requires an in-depth analysis of a project's possible impact.  It begins with the action agency submitting a written request to initiate consultation that must contain very specific information.[110]  During Formal Consultation, the FWS is given clear-cut duties,[111] and, at the end of the process, must produce a Biological Opinion that should contain precise, in-depth information.[112]

Formal Consultation is not required if, through Biological Assessment and Informal Consultation, the FWS concludes that there is no risk to an endangered species.[113]  In this case the Corps and the FWS concluded that Formal Consultation was not essential.  Plaintiffs assert that a Formal Consultation is crucial for the IBW's  protection and survival.

### 2.  Standard of Review

When determining agency compliance with the ESA, the deferential standard of review is applied, just as it is under NEPA; i.e. an agency decision may not be set aside unless it is found to be arbitrary or capricious.[114]  Because the FWS is the government agency with primary

---

[109]*Id.*

[110]50 C.F.R. § 402.14(c).

[111]50 C.F.R. § 402.14(g).

[112]50 C.F.R. § 402.14(h).

[113]*Preston v. Yeutter*, 33 F.3d 59 (9th Cir. 1994).

[114]*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears, et al. v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982) (concluding that the appropriate standard under the ESA is the arbitrary and capricious standard provided by the APA).

responsibility over protection of a  listed species, it is given some additional discretion to make jeopardy determinations.[115]

     The citizen suit provision of the ESA creates a right of action to challenge or compel agency compliance with ESA requirements.  But, it does not direct courts to conduct *de novo* review of such actions.[116] In other words, a court is not empowered to substitute its judgment for that of the agency.[117]

     While courts must defer to an agency's reasonable interpretation of equivocal scientific evidence, such deference is limited. The presumption of agency expertise may be rebutted if its decisions are not rational.[118] A decision is not rational if there is no reasonable connection between the facts found and the choice made.[119]

### 3.  Injunctive Relief under ESA

     Unlike NEPA, the ESA is self-enforcing--this is to say that there is a particular section of the ESA authorizing individuals to file actions for injunctive relief.[120] Therefore, in most cases, a citizen can sue a federal agency, asking for an injunction under the ESA, without relying on the APA, but there are some limitations.

---

[115]*Nat'l Wildlife Federation v. Coleman*, 529 F.2d 359, 375 (5th Cir. 1976).

[116]*Id.*

[117]*Citizens to Preserve Overton Park, Inc.*v. Volpe,  401 U.S. 402, 416 (1971); *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Service*, 273 F.3d 1229, 1236 (9th Cir. 2001).

[118]*Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

[119]*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 88 (1983).

[120]16 U.S.C. § 1540(g)(1)(A) and (C).

A citizen cannot bring suit against the Department of the Interior if it involves the Department's administrative responsibilities.[121]   Under the ESA, a citizen can ask for an injunction against the Department of the Interior *only* for failure to perform certain duties set out in § 1533 of the ESA.[122]   The claims in this case have nothing to do with those duties.

Because the FWS is an arm of the Department of Interior, a direct suit is only available under the same limited circumstances.[123]   Thus, the APA is a necessary enforcement mechanism where the Department of the Interior and the FWS have allegedly violated procedural duties under the ESA.

Plaintiffs concede that their ESA claim must be brought against the FWS through the APA -- but Plaintiffs and the FWS disagree on the standard for injunctive relief.  The FWS argues that, if it is not subject to the citizen-suit provision of the ESA, then the same standard for injunctive relief applied under NEPA should also be applied under ESA.  In other words, the FWS asserts that the equitable factors outlined in *Dataphase*[124] should be applied.  Plaintiffs counter that a less stringent standard is applicable to all ESA claims involving *substantive* provisions of the ESA.

---

[121]*Bennett v. Spear*, 520 U.S. 154 (1997).

[122]16 U.S.C. § 1533 applies to the designation of an endangered species and its critical habitat by the Secretary .

[123]*Bennett*, 520 U.S. at 174 ("Viewed in the context of the entire statute, § 1540(g)(1)(A)'s reference to any "violation" of the ESA *cannot be interpreted to include the Secretary's maladministration of the ESA*.") (emphasis added).

[124]640 F.2d at 114.

Under *Dataphase*, a district court is required to weigh and balance harms to the parties before imposing, or refusing to impose, injunctive relief.[125]  Under this traditional approach, the basis for injunctive relief is irreparable harm.[126]

However, Plaintiffs assert that traditional equitable discretion accorded Courts is limited under the ESA, even when the Defendant is an arm of the Department of the Interior.  Plaintiffs contend that irreparable harm is presumed when an endangered species is threatened.   Plaintiffs cite an Eighth Circuit case, *Burlington N.R.R. Co. v. Bair*,[127] where "reasonable cause" rather than "irreparable harm" was used to justify injunctive relief:

> It is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. In such situations, it is not the role of the courts to balance the equities between the parties. The controlling issue is whether Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits.[128]

The power of federal courts to issue injunctions was examined by the Supreme Court in *Weinberger v. Romero-Barcelo*.[129] In that case, the Supreme Court concluded that "a federal judge siting as chancellor is not mechanically obligated to grant an injunction for every violation of law."[130]   Instead, the Court held that, before an injunction is issued without reference to traditional equitable principles, the alleged violation must be one that is contrary to an *explicit*

---

[125]*Id.*

[126]*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

[127] 957 F.2d 599, 602-03 (8th Cir. 1992).

[128]*Id.*

[129]456 U.S. at 312.

[130]*Id.* at 313.

provision contained in the statute -- a "flat ban."[131]  Referring to *TVA v. Hill*,[132] the Supreme

Court found that the plain purpose of the ESA, not "the bare fact of a statutory violation,"

compelled injunctive relief.[133]  The Eighth Circuit also concluded that when faced with a  "flat

ban," the only remedy is an injunction.[134]

The Supreme Court and Eighth Circuit opinions make it clear that the "reasonable cause"

standard applies when the violation involves not only a substantive provision of underlying

federal law, but an  *explicit* provision of the law -- i.e.,  if it involves a clear message from

Congress.   When Congress includes a flat ban in a statutory scheme, Congress has already

balanced the equities and decided how the scales should tip.  Whether the Corps and the FWS are

in violation of a flat ban of the ESA case is discussed below.

### 4.  Analysis

This case is as distinct as the IBW.  After disappearing from sight for 60 years, the IBW

suddenly reappeared within the GPP area, compelling the Corps and the FWS to balance the

interest of ensuring the survival of  the IBW and preventing depletion of the Alluvial aquifer.  The

decisions made by the Corps and the FWS are at the center of this case.

When the IBW was discovered, the Corps immediately suspended activity on the GPP and

began to engage in the procedural process required by the ESA and its regulations.  The Corps

started work on a Biological Assessment and engaged in Informal Consultation with the FWS.

The FWS accepted this approach, and by-passed Formal Consultation.

---

[131]*Id.* at 314 (emphasis added).

[132]437 U.S. 153 (1978).

[133]*Id.*

[134]*Burlington*, 957 F.2d at 601.

The Biological Assessment submitted by the Corps included a partial survey of the action area to determine the IBW's possible presence. The Biological Assessment describes the survey in the following manner: "Team members . . . visited mutually agreed upon sites (generally sites where construction was close or through forested areas), identified the tree species and general age of the stand."[135]

Mark Smith, a biologist who prepared the BA for the Corps,[136] submitted an affidavit that gives more detail about these surveys and stated that 2 acres of forest adjacent to the White River at the intake station were surveyed, 2.5 acres at the western end of the action area were also surveyed, and 1 acre of forest on the southwestern edge of the work area was surveyed.[137]

In its June 2005 concurrence letter, the FWS admitted that "[t]he surveys were not specifically designed to collect visual records of IBW, or locate cavity trees or bark scaling,"[138]and recognized that less than eight percent of the action area had been searched for IBW presence.[139] Three months after issuing this letter, the FWS released a *Recovery Outline for the Ivory-billed Woodpecker*.[140] In this outline, the FWS recognized that, in order to protect the IBW, identifying its habitat is crucial:

> Research and intensive surveys are anticipated to play a major role in the initial steps
> taken toward recovery because it is not possible to design a comprehensive recovery
> strategy without information on the status of the population. *Once such information*

---

[135]Pl. Ex. E, Biological Assessment, Doc. No. 15-10.

[136]Mr. Smith is a fishery and wildlife biologist in the environmental branch of the Memphis District of the Corps.

[137]Def. Ex., Smith Declaration, ¶ 10, Doc. No. 17-2.

[138]Pl.Ex. E, June 8 Concurrence Letter, ¶ 7, Doc. No. 15-10.

[139]*Id.*

[140]Pl. Ex. B, published September 2005, Doc. No. 15-8.

*is obtained, further development of recovery actions to include specific habitat management or protective measures can be developed.*[141]

When considering habitat identification in connection with completion of the GPP, the FWS limited the survey range. It asked the Corps to conduct a survey of "all suitable habitat within a one mile radius of any construction site in a forested area."[142] But, the selection of a one mile radius next to construction sites does not match the scientific data, and does not meet the regulation's definition of "action area."

Selecting a one mile radius is contradicted by FWS's conclusion that the IBW forages between .75 miles to 1.5 miles from their nest cavities, with an outer limit of 2.5 miles for a lone male,[143] and an even greater winter range.[144] Moreover, surveying areas that are adjacent to construction sites does not take into account areas that are indirectly affected by water diversion. Under the ESA's regulations an agency's "action area" includes all areas that a project may directly and indirectly affect. By requiring this limited survey, the FWS disregarded the need to identify IBW habitat in wetlands that will be indirectly affected by the Corps's action.[145]

---

[141]*Id.*(emphasis added).

[142]Pl .Ex. E, June 8 Concurrence Letter, ¶ 7, Doc. No. 15-10; Def. Ex.,Walsh Declaration ¶ 22 and ¶ (1)(a) and (b), Doc. No. 17-10.

[143]*See* Pl. Ex. E, Concurrence Letter, Doc. 15,-8. This data is based on the observations made by Tanner in the 1940's. Tanner recorded the basic range during nesting season as 1.2 km to 2.4 km from the nest (which is approximately .75 to 1.5 miles) and 4.0 km. for a lone male (which is approximately 2.5 miles); see Def. Ex. *The Birds of North America Online*, "Demography and Populations," Ex. 4 of Walsh Declaration, Doc. No. 18.

[144]Pl. Ex. E, June 8, 2005 Concurrence Letter ¶ 1(a), Doc. No. 15-10.

[145]*Id.* at ¶ 25; *See also* Def. Ex., Declaration of Noreen Walsh, Doc. No. 17-11 (Walsh is Regional Director of the FWS and stated in her affidavit that there was "no doubt" that water diversion will affect portions of the White River flood plain.)

The statute and regulations require that the presence of an endangered species in the "action area" should be established before reaching additional conclusions.[146] The FWS and the Corps did not conduct on-site surveys in the "action area" to make this initial determination. Instead, the FWS designated the entire GPP area as "potential" habitat,[147] and without conducting any additional surveys, the FWS and the Corps concluded that construction, laying pipeline, and diverting water in this "potential" habitat would have no adverse impact. They put the cart before the horse. Without conducting on-site surveys that adequately identify IBW habitat in the action area, the FWS and the Corps cannot rationally explain a "no adverse impact" decision.

Although detailed habitat surveys are not neccesarily required, the FWS conceded the importance of gathering such data in its concurrence letter,[148] its Recovery Outline,[149] and in its formal Notice of Concurrence.[150] While acknowledging that habitat surveys were crucial, the FWS

---

[146]Section 7 of the ESA requires information verifying that a listed species is present in the area of agency action; 50 C.F.R. 402.12 requires that, before starting a project, an agency or the FWS should determine if a listed species may be present in action area; 50 C.F.R. 402.12(f) recommends that an on-site inspection of the area affected be preformed to determine if a species may be present. *See also*: *Bensman*, 984 F.Supp. at 1248-49 (Under the ESA, a federal agency has an affirmative duty to identify the habitat of an endangered species before approving further action).

[147]*See* Def. Ex., *Ivory-billed Woodpecker Endangered Species Act Section 7 Consultation Guidance*, October 26, 2005, Doc. No. 17-16. (In these guidelines, "potential" IBW habitat was described by the FWS as covering Arkansas, Desha, Jefferson, Lincoln, Monroe, Phillips, Prairie and Woodruff Counties in Arkansas, including the large forest in the lower White River flood plain encompassing the Cache River Wildlife Reserve, the White River Wildlife Reserve, and the Dagmar and Wattensaw Wildlife Management Areas.); *See also*, Def. Ex., *Potential Ivory-billed Woodpecker Habitat in the Grand Prairie Area Demonstration Project Area,* Doc. No. 15-12 (Map issued by the FWS showing potential habitat as a wide ranging area extending from Hazen, Arkansas to Dewitt, Arkansas).

[148]Pl. Ex. E, June 8, 2005 Concurrence Letter, Doc. No. 15-10.

[149]Pl.Ex. B, *Recovery Outline for the Ivory-billed Woodpecker*, Doc. No. 15-8.

[150]Doc. No. 40.

agreed that there would be no adverse effect, and the Corps committed to further federal expenditure, before conducting surveys.  For instance, concrete work on the pump-station will be allowed to continue even though habitat surveys in construction areas have not yet been completed.[151]  In addition, the pump-station will be built, and operational before the White-River flood plain is monitored.[152]  Finally, the Survey Criteria agreed on by the FWS and Corps show that the building will continue while surveys are ongoing and will only stop when IBW signs are confirmed.[153]

Applying the standards of review discussed above, the FWS and the Corps acted within the scope of their legal authority by opting for a Biological Assessment combined with an Informal Consultation.  However, within that context, they failed to properly follow recommended procedures.

The plan agreed to by the Corps and FWS provides, at best, hit or miss protection for the IBW, because it calls for surveys to be done while the construction activity continues.  This violates the purpose of the ESA which forbids the commitment of federal funds *before* determining if the species is present and threatened. Without appropriate habitat data within the "action area," any conclusion that the IBW will not be adversely affected by the GPP is without a rational basis and is, therefore, arbitrary and capricious.

With respect to the basis for injunctive relief,  the "reasonable cause" standard does not apply.  While the FWS and the Corps did not rationally comply with substantive duties of the Act and its regulations, they did not defy a flat ban.

---

[151]Doc. No. 45.

[152]Doc. No. 45.

[153]Def. Ex. 2, Doc. No. 40-2. (The FWS requires that once signs of IBW are confirmed, all construction will stop and "Section 7 consultation will be reinitiated." The FWS does not explain what will happen once consultation is "reinitiated.").

The facts of this case are not like the facts in *Hill*,[154] where a federal agency was poised to completely destroy a critical habitat of a listed species. Nor are these facts similar to those in *Burlington*,[155] where the State of Iowa attempted to tax a railroad in direct violation the Railroad Revitalization Reform Act of 1976.

The FWS and the Corps, were not violating a direct order from Congress by failing to reasonably interpret their duties under the ESA. Preforming an "on-site" habitat search is recommended but not absolutely required by the ESA regulations. Therefore, the *Dataphase* factors are applicable.[156] As is always true -- when weighing these factors to determine whether the extraordinary relief of a preliminary injunction should be granted -- no single factor is in itself dispositive.[157] All of the factors must be considered to determine whether the balance weighs towards granting the injunction.[158]

For the reasons set out above, the conclusion of no adverse effect by the Corps and FWS lacks rational foundation. Therefore, Plaintiffs have shown a likelihood of success by showing that the Corps and FWS acted arbitrarily and in violation of APA and the ESA. Next, I am required to balance equities, consider the competing public interest, and the threat of irreparable harm.

When an endangered species is allegedly jeopardized, the balance of hardships and public interest tip in favor of the protected species.[159] Here, there is evidence that the IBW may

---

[154]437 U.S. 153.

[155]957 F.2d at 601-02.

[156]*Dataphase Systems, Inc.,* 640 F.2d at 109.

[157]*Calvin Klein Cosmetics v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987).

[158]*Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir. 1993).

[159]*Hill*, 437 U.S. at 174 (Congress intended endangered species to be afforded the highest of priorities) (emphasis added); *Babitt v. Sweet Home Chapter of Communities for a Great*

be jeopardized.  The FWS has already partially halted construction, until the Corps conducts additional surveys.  Issuing a preliminary injunction to ensure that the FWS-required surveys are rational and based on the best scientific information, will not unreasonably burden completion of the GPP.   The public interest in preserving the Alluvial aquifer will be better served by determining whether the GPP will jeopardize the IBW, before further commitment of time and money are made to a project that may be doomed by unanticipated discoveries.

In view of the above, further work on the GPP is enjoined.  Defendants must reinitiate Informal Consultation and include the following information in an Amended BA:  nest, roost, and active forage surveys within 2.5 miles[160] of any construction site "footprint;" identification and inspection for nesting, roosting, or active foraging in all trees 12 inches or greater in areas that will be most affected by changes in water level; and nest, roost, and foraging surveys in the forest areas adjacent to canals and pipelines.  The Motion for Preliminary Injunction under the Endangered Species Act is GRANTED.

IT IS SO ORDERED this 20th day of July 2006.


/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE


---

*Oregon*, 515 U.S. 687, 699 (1995) (the plain intent of Congress in enacting the ESA was to reverse the trend of species extinction whatever the costs);  *National Wildlife Federation v. Burlington Railroad, Inc.*, 23 F.3d 1508 (9th Cir. 1994) (citations omitted); *Bensman v. U. S. Forest Service,* 984 F. Supp. 1242; *Stahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997).

[160]The 2.5 mile range is based on the Tanner research relied on by the FWS which established that this is the range for lone males during nesting season.