**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**NATIONAL WILDLIFE FEDERATION and
ARKANSAS WILDLIFE FEDERATION**                                    **PLAINTIFFS**

**V.**                                  **4:05-CV-01278-WRW**

**FRANCIS J. HARVEY, in his official capacity
as Acting Secretary of the U.S. DEPARTMENT
OF THE ARMY and GALE NORTON, in her official
capacity as Secretary of the Department of the Interior**          **DEFENDANTS**

<u>**ORDER**</u>

Pending are Plaintiffs' Motion for Summary Judgment and Permanent Injunction (Doc.

No. 75) and Defendants' Cross Motion for Summary Judgment (Doc. No. 81).  Plaintiffs have

responded,[1] and Defendants have replied.[2]

**I.      FACTUAL BACKGROUND**

**a.      The Grand Prairie and Alluvial and Sparta Aquifers**

The Grand Prairie consists of approximately 500,000 acres located between the

Mississippi and Arkansas Rivers and has become one of the major rice producing areas of the

world.  The White River runs directly through the region and water used to support agriculture

has come primarily from wells drilled into the Alluvial Aquifer.

The Alluvial Aquifer provides millions of gallons of water annually to the region.  It is an

unconfined aquifer, which means it can be replenished by surface water.  As a result of irrigation

needed for agricultural production, the water level of the Alluvial Aquifer has steadily decreased

during the past century.

---

[1]Doc. No. 83.

[2]Doc. No. 84.

Since the Alluvial Aquifer cannot meet the agricultural demand, the Sparta Aquifer is being used as well.  The Sparta Aquifer provides drinking water for local residents and water for local industry.  The Sparta Aquifer, unlike the Alluvial Aquifer, is a confined aquifer, which means it cannot be easily replenished by surface water because the water is trapped below a nearly impermeable upper clay-like layer.  Its water depth is also declining.

Based on the current rate of usage, scientists estimate that the Alluvial Aquifer will go dry, or nearly dry, in four to nine years.  Many scientists believe that if the Alluvial Aquifer drys up, the underlying Sparta Aquifer may be contaminated, making it unfit for drinking water.

The Grand Prairie Project ("GPP"), which is under attack in this lawsuit, is designed to prevent the depletion of the Alluvial and Sparta Aquifers by pumping water from the White River and delivering it to the Grand Prairie farmland for irrigation.  This will be done by constructing a pumping station, and by using a system of man-made canals, pipelines, and existing streams.

The pumping station for the GPP will be located next to the White River, northeast of DeValls Bluff, Arkansas.[3]  The GPP's pumping station, water withdrawal, and water delivery systems will affect the Cache River Wildlife Refuge and the Wattenensaw Wildlife Management Area.[4]  Importantly, the GPP's impact area will include the White River National Wildlife Refuge, which is home to the largest remaining functional bottomland hardwood ecosystem on any tributary of the Mississippi River.  This area is renowned for its fish and wildlife, as well as

---

[3]Pl. Ex. E, Biological Assessment, p. 1, Doc. No. 15-10.

[4]*Id.*

the overall uniqueness of its ecosystem.  It is also the last known North American refuge of the

Ivory-billed Woodpecker ("IBW").[5]

### b.        The Ivory-billed Woodpecker

The IBW is the largest woodpecker in the United States and the second largest in the

world.  The IBW was thought to be extinct since 1944; however, in April 2005, scientists

confirmed a sighting in the Cache River National Refuge, and it was heard in the White River

National Wildlife Refuge.

The primary reason for the decrease in the IBW appears to be a reduction in suitable

habitat because of logging and conversion of forest habitats.[6]  James Tanner, who studied the

IBW in the 1940s, wrote, "[i]n many cases the [IBWs] disappearance almost coincided with

logging operations.  In others, there was no close correlation, but there are no records of [IBWs]

inhabiting areas for any length of time after those [areas] have been cut over."[7]  The United

States Fish and Wildlife Service ("FWS") wrote that extensive habitat loss and fragmentation,[8]

and the lack of information on specific habitat requirements, remain a threat to this species.[9]

In order to thrive, the IBW must have uninhabited forest with old-growth trees and a

continuous supply of newly dead trees.  A single breeding pair may need as much as seventeen

square miles of bottomland forest to survive.  The IBW forages in trees greater than 11.8 inches

---

[5]The IBW was also thought to exist in Cuba.

[6]United States Fish and Wildlife Service.  2006.  Recovery Plan for the Ivory-billed Woodpecker (*Campephilus principalis*).  U.S. Fish and Wildlife Service, Atlanta, Georgia. iv pp.

[7]*Id.*

[8]Fragmentation refers to breaking up large, continuous forests into smaller blocks by roads, clearing, urbanization, or other human development.

[9]*Id.*

in diameter at breast height ("dbh"),[10] where they feed on beetles and beetle larvae in dead trees, and on ground dwelling insects.  The IBW is known to nest forty feet above ground in large dead trees or in dead portions of live trees.

## II.   PROCEDURAL BACKGROUND

In 1996, Congress authorized the Grand Prairie Region and Bayou Meto flood control project.[11]  The United States Corps of Engineers ("Corps"), after years of studying plans for agricultural water supply, groundwater management, and conservation, issued a draft Environmental Impact Statement ("EIS") in 1998.  After public comment, the Corps issued the final EIS in 1999, and, after a second round of public comment, the Corps approved a Record of Decision ("ROD") in February, 2000.[12]

Four years later, the project was challenged by the Arkansas Wildlife Association, the National Wildlife Association, and other conservation groups.  A complaint was filed in February, 2004, alleging violations of the National Environmental Policy Act ("NEPA") and requesting preliminary and permanent injunctions.

On March 4, 2004, the Corps issued a draft Environmental Assessment ("EA") that addressed changes to the original plan, primarily requiring the replacement of canals with pipelines.  A Finding of No Significant Impact or FONSI was issued by the Corps on July 2, 2004. The final EA calculated that construction of the pump station, inlet channel, pipelines, canals, and the regulating reservoir would cause temporary effects to 60 acres, and permanent effects to 75 acres of upland hardwoods, bottomland hardwoods, and forested

---

[10]Diameter at breast height is a standard method of expressing the diameter of a tree trunk.  Breast height is 4.5 feet above the forest floor on the uphill side of the tree.

[11]See Water Resource Development Act of 1996, Pub. L. 104-303, § 363(a).

[12]Pl. Ex. O, Record of Decision, Doc. No. 15-12.

swamps.  In addition, the Corps conceded that the project would cause 11 acres of temporary and 30 acres of permanent destruction of the scrub/shrub swamp, and 1 acre of permanent destruction of marshland.[13]

In November, 2004, United States District Judge G. Thomas Eisele issued and opinion in November, 2004[14] finding that "the Grand Prairie Project will not adversely impact the White River or its Basin."[15]  The district court reasoned that "[t]he minimum flow requirements set forth a minimum level of water depth for the White River sufficient to sustain navigation, fisheries, and wetlands."[16]  The court emphasized that the minimum flow requirement would protect the White River and its ecosystem because, if the River were to drop below a certain level, no more water could be pumped out.  The court concluded:

> The Court has extensively reviewed the [Final Environmental Impact Statement]. . . . Based on this review, the Court concludes that the Corps complied with the [National Environmental Policy Act] and the [Council on Environmental Quality] regulations in its evaluation of the direct and indirect environmental impacts of the project, and, in particular, the Corps' study of the impact of the project upon the wetlands and bottomland hardwoods of the White River Basin.[17]

The Eighth Circuit affirmed this decision.[18]

---

[13]Pl. Ex. J, June 8, 2005 Concurrence Letter, Doc. 15-10.

[14]*Arkansas Wildlife Fed'n., et al v. U.S. Corp of Engineers, et al.,* No. 4:04CV133-GTE *aff'd* 431 F.3d 1096 (8th Cir. 2005).

[15]*Id.* at 51-52.

[16]*Id.*

[17]*Id.* at 53.

[18]*Arkansas Wildlife Fed'n.*, 431 F.3d 1096 (8th Cir. 2005).

After the district court's ruling, the Corps began the first phase of the GPP --
construction of the six-unit pumping station.  The Corps awarded a contract and construction
was authorized to begin in April, 2005.

On April 28, 2005, the FWS announced the rediscovery of the IBW, and the Corps
suspended construction.[19]  Beginning in May, 2005, the Corps evaluated the effects of the GPP
on the IBW and issued a Biological Assessment on May 24, 2005.  In its assessment, the Corps
concluded that the GPP was not likely to adversely affect the IBW.[20]

Before entering a formal concurrence, the FWS issued a letter to the Corps directing it to
meet specific requirements.[21]  The letter required the Corps to conduct pre-construction surveys
for IBW habitat, delay construction if the habitat was within one mile of the construction site,
and adopt long-term monitoring of water withdrawals.[22]  Water flow monitoring was required
because, even with the minimum flow cutoff, the GPP's operation would alter water levels in the
area -- making some forested wetlands slightly drier -- and affecting the "flood plain
resources."[23]  After notification of the Corps's Biological Assessment, and the FWS's letter of
concurrence issued on June 8, 2005, Plaintiffs filed this action on September 8, 2005.

Plaintiffs' complaint alleges that the FWS violated the Endangered Species Act ("ESA")
and the Administrative Procedure Act ("APA") when it arbitrarily concluded that the GPP
would not adversely affect the IBW.  The Complaint also alleges that the Corps violated the

---

[19]Def. Ex. Walsh Decl., ¶ 11, Doc. No. 17-11.

[20]Def. Ex., Norman Decl., ¶ 8, Doc. No. 17-3.

[21]Pl. Ex. J, Doc. No. 15-10.

[22]Pl. Ex. E, Biological Assessment, Doc. No. 15-10.

[23]Pl. Ex. J, June 8, 2005 Concurrence Letter, Doc. No. 15-10.

National Environmental Policy Act ("NEPA") when it failed to do a supplemental Environmental Assessment or EIS.[24]

Plaintiffs allege that jeopardy to the IBW and its habitat is likely because: (1) the Corps will destroy 135 acres of forest without ruling out the possibility that it may include the bird's nesting, roosting, and foraging trees; (2) the GPP will draw 158 billion gallons of water each year from the White River, which will significantly reduce the water levels in the wetland forests; (3) some tree species will die when water levels fall, and the forest will gradually decline; (4) the FWS never revealed which trees would be most threatened by the change in water level; (5) the Corps, in 2005, was rushing to construct a massive pumping station located fourteen miles away from the IBW sighting which could jeopardize the IBW chances of survival; (6) the canals and pipelines will fragment the bottomland forest, which may adversely affect IBW habitat; and (7) the noise and human activity involved in construction and pumping activity will adversely affect the IBW.  Plaintiffs note that there is very little known about the IBW, and more study is necessary before beginning such a large, irreversible commitment of federal resources.

On April 4, 2006, Defendants filed a Notice of Completion of the Endangered Species Act Section 7 Consultation.[25]  The Corps and the FWS agreed to habitat surveys, long-term botanical and hydrologic monitoring, and an adaptive management plan ("AMP").[26]

---

[24]Doc. No. 23.

[25]Doc. No. 40.

[26]*Id.*

On July, 20, 2006, I entered an Order denying Plaintiff's Motion for Preliminary Injunction as to their NEPA claim but granting it as to their ESA claim.[27]  I determined that the agencies complied with NEPA because the Corps and the FWS took a "hard look" at the GPP after discovery of the IBW.  However, as to Plaintiffs' ESA claim, I determined that there was evidence that the IBW might be jeopardized, and I enjoined the GPP.[28]

After my decision, the agencies reinitiated consultation and conducted additional surveys for the IBW.  The Corps evaluated the potential impacts[29] of the GPP on the IBW and found that the GPP would affect up to 135 acres, including 96 acres of uplands, 31 acres of bottomland hardwoods, and 8 acres of forested swamp.

In June 2005, the FWS provided draft survey criteria for the GPP.  The FWS surveyed all suitable habitat -- which is forested areas with overstory of trees greater than 12 inches dbh -- within a one-mile radius of a construction site.[30]  The surveys, however, excluded areas within a quarter-mile of human structures.[31]  The surveys were to document IBW presence, including nesting and roosting cavities and signs of foraging.[32]  Cavities were to be monitored for the last two hours of daylight for five days.[33]

---

[27]Doc. No. 48.

[28]*Id.*

[29]The parties refer to the effects of the GPP as "impacts" rather than "impact."  I will defer to their expertise on this term despite my notion that generally "impacts" is a verb while "impact" is a noun.

[30]Def. Ex. Ivory-billed Woodpecker Survey Criteria, Doc. No. 40-3.

[31]*Id.*

[32]*Id.*

[33]*Id.*

The Draft Survey criteria above were changed following input from biologists and scientists.  The surveying of areas dominated by trees 12 inches in dbh was changed to 16 inches in dbh in the Final Survey Criteria.  Also, the monitoring period of the last two hours of daylight for five days was changed to a much shorter monitoring period of observation of potential cavities -- at the last two hours of daylight for two non-consecutive days separated by at least one week.

The Corps completed a Supplemental Biological Assessment, which included a long-term monitoring and adaptive management plan to ensure that the GPP would not adversely affect the IBW or its habitat.  After examining the evidence, the Corps and the FWS agreed that the GPP was not likely to adversely affect the IBW.  Plaintiffs now challenge that conclusion.

## III.    STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[34]  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[35]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[36]  Nevertheless, summary judgment promotes judicial economy by

---

[34]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[35]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[36]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

preventing trial when no genuine issue of fact remains.[37]  I must view the facts in the light most favorable to the party opposing the motion.[38]  The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[39]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[40]

### B.      Administrative Procedure Act

The APA sets forth the standard of review for the NEPA and the ESA.  Under the APA, an agency administrative decision may be set aside only if it is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law";[41] "in excess of statutory authority";[42] or "without observance of procedure required by law."[43]  A decision is arbitrary or capricious if the agency relied on factors forbidden by Congress, did not consider an important

---

[37]*Id.* at 728.

[38]*Id.* at 727-28.

[39]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[40]*Anderson*, 477 U.S. at 248.

[41]5 U.S.C. § 706(2)(A).

[42]*Id.* at § 706(2)(C).

[43]*Id.* at § 706(2)(D).

aspect of the problem, or offered an explanation that is implausible or contrary to the evidence.[44]

Deference is given to an agency's choice of methodology so long as it has a proper foundation.

The agency must provide a satisfactory explanation for its actions based on relevant data,[45] and

courts look for clear errors of judgment.[46]  Unless it is shown that the Corps and the FWS

blocked out informed opinion and overextended their reach, their judgment should be accepted.

Despite this deferential standard of review, courts should not rubber-stamp administrative

decisions if they are inconsistent with statutory purpose or frustrate congressional policy.[47]  But,

if an agency's decision is supported by any rational basis, it must be upheld.[48]  Even if the

agency uses flawed data, its decision may be set aside only if "there is a significant chance that,

but for the errors, the agency might have reached a different result."[49]

### C.      Permanent Injunction

There is no authority for injunctive relief under NEPA, but once noncompliance with

NEPA is shown, the federal courts have uniformly held that injunctive relief is appropriate.[50]  In

determining whether a permanent injunction should be issued, I must take into account: (1) the

threat of irreparable harm to the moving party; (2) the harm to the other party if the injunction is

granted; and (3) the public interest.[51]  The standard for a permanent injunction is essentially the

---

[44]*Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[45]*Niobrara River Ranch, L.L.C. v. Huber*, 373 F.3d 881, 884 (8th Cir. 2004).

[46]*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

[47]*Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 291 (1965).

[48]*S.W. Bell Tel. Co. v. Fed. Comm. Comm'n.*, 153 F.3d 523, 554 (8th Cir. 1998).

[49]*Century South Dakota Co-op. Grazing Dist. v. Secretary of the United States Department of Agriculture*, 266 F.3d 889, 899 (8th Cir. 2001).

[50]*Comm. for Nuclear Responsibility, Inc. v. Schlesinger*, 404 U.S. 917, 921 (1971).

[51]*Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

same as a preliminary injunction, except Plaintiffs must show actual success on the merits for the former rather than likely success on the merits.[52]

## IV.   DISCUSSION

### A.   Endangered Species Act

#### 1.   Overview

The Supreme Court characterized the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[53]   The purpose of the ESA is "to provide a means whereby the ecosystem upon which endangered species and threatened species depend may be conserved."[54]   Congress intended to halt and reverse extinction of endangered species "whatever the costs."[55]   The ESA, unlike NEPA, imposes substantial, continuing, and affirmative obligations on federal agencies.

The ESA empowers the Secretary of Commerce to recommend: (1) when a species should be listed as endangered; and (2) what habitat should be listed as critical.[56]   After a species is identified as endangered, the Secretary of the Interior must develop plans for its survival.[57]

The IBW was first listed as endangered under the Endangered Species Preservation Act of 1966 and then under the Endangered Species Conservation Act of 1969.[58]   Unlike the ESA, these early endangered species laws did not require critical habitat to be defined.  When the ESA

---

[52]*Id.*

[53]*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

[54]16 U.S.C. § 1531(b).

[55]*TVA*, 437 U.S. at 157.

[56]16 U.S.C. § 1533(a)(2)(A).

[57]16 U.S.C. § 1533(f).

[58]See 32 Fed. Reg. 4001(Mar. 11, 1967) and 35 Fed. Reg. 8495 (June 2, 1970).

was enacted and later amended, it did not require habitat designation for species listed before

November 10, 1978, such as the IBW.[59]  Although the IBW was one of the first species listed as

endangered under the ESA,[60] its critical habitat has never been established.

Section 7 of the Endangered Species Act sets out the requirements for all federal agencies

to ensure that any action that is authorized, funded, or carried out is not likely to jeopardize an

endangered species or adversely modify its critical habitat.[61]  An agency will "jeopardize an

endangered species if it reasonably would be expected, directly or indirectly, to reduce

appreciably the likelihood of both the survival and recovery of a listed species . . . by reducing

the reproduction, numbers or distribution."[62]

The ESA requires a procedural consultation when an agency proposes an action that may

affect an endangered species.[63]  An agency must use the best scientific and commercial data

available and consult with the FWS if the agency has reason to believe that an endangered

species may be present in the area of a proposed action.[64]  An agency can perform this

consultation by several different methods: a biological assessment; informal consultation; or

formal consultation.

---

[59]Section 2(b)(4) of the Endangered Species Act Amendments of 1982, Pub. L. 97-304, 96 Stat. 1411.

[60]*Id.*

[61]*State of Idaho By and Through Idaho Public Utilities Comm'n. v. I.C.C.*, 35 F.3d 585 ( D.C. Cir. 1994); 16 U.S.C. § 1536(a)(2).

[62]50 C.F.R. § 402.02.

[63]16 U.S.C. § 1536; 50 C.F.R. § 402.14(a).

[64]16 U.S.C. § 1536(a)(3) and 16 U.S.C. § 1536(c)(1).

### a.    Biological Assessment

A biological assessment is a study prepared under the direction of the FWS that evaluates the potential effects of the project on an endangered species.  A biological assessment must be completed before the project starts.

Before a project can begin, an agency must submit either a written request to the Director of the FWS asking for a list of endangered species in the action area or written notification that an endangered species is in the area.[65]  The Director must respond within 30 days with the list of endangered species or agree with the agency's notification.

If there is a possibility that an endangered species is in the area, the agency must prepare an evaluation of the project's potential effects on the species and find whether a species is likely to be adversely affected.[66]  If the biological assessment finds that the project is not likely to adversely affect a listed species, and the FWS concurs in writing, the project may go forward.[67]  However, if the proposed project might affect an endangered species, formal consultation is required.[68]

### b.    Informal Consultation

Informal consultation is an optional process that includes all discussion, correspondences, etc., between the FWS and the federal agency.[69]  During informal consultation, the FWS may suggest modifications to the proposed project that would avoid the likelihood of adverse effects

---

[65]50 C.F.R. § 402.12.

[66]50 C.F.R. § 402.12(a).

[67]50 C.F.R. § 402.14.

[68]*Id.*

[69]50 C.F.R. § 402.13(a).

14

to an endangered species or its habitat.[70]  After informal consultation, if the federal agency

determines, with concurrence of the FWS, that the action is unlikely to adversely affect an

endangered species or its critical habitat, no further action is needed.

c.       Formal Consultation

If it is determined that a project might affect an endangered species or its critical habitat,

formal consultation is required.[71]  However, formal consultation is not necessary if the federal

agency and the FWS agree that the project will not likely adversely affect any endangered

species in the area or the species critical habitat.[72]  Formal consultation requires an in-depth

analysis of a project's potential impact.  Formal consultation starts with the agency submitting a

written request to initiate consultation.  This request must contain very specific information to be

considered, such as a description of the action, the areas that might be affected by the action, and

any endangered species in the action area that may be affected.[73]  At the conclusion of a formal

consultation, a Biological Opinion which must include precise, in-depth information is

produced.[74]

2.       Standard of Review

When determining whether an agency has complied with the ESA, the deferential

standard of review is applied.[75]  An agency decision may not be set aside unless it is found to be

---

[70]50 C.F.R. § 402.13(b).

[71]50 C.F.R. § 402.14(a).

[72]50 C.F.R. § 402.14(b).

[73]50 C.F.R. § 402.14(c)

[74]50 C.F.R. § 402.14(h).

[75]*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears, et al. v. Peterson*, 685
F.2d 678, 686 (D.C. Cir. 1982) (concluding that the appropriate standard under the ESA is the
arbitrary and capricious standard provided by the APA).

arbitrary or capricious.[76]  Because the FWS is the government agency with primary

responsibility for protecting endangered species, it is given some additional discretion to make

jeopardy determinations.[77]

A citizen cannot bring suit against the Department of the Interior if it involves the

Department's administrative responsibilities.[80]  The ESA permits citizens to request an

injunction against the Department of Interior only for failing to perform duties set out in § 1533

of the ESA, which are not at issue in this case.  And since the FWS is an arm of the Department

of Interior, a direct suit is available only in the same limited circumstances.  Thus, the APA,

which provided the process for federal courts to review agency decisions, is a necessary

enforcement mechanism where the Department of the Interior and the FWS have allegedly

violated the procedural duties under the ESA.

The party bringing an APA case bears the burden of demonstrating that the agency's

actions were arbitrary and capricious.[81]  Although courts must defer to an agency's reasonable

interpretation of equivocal scientific evidence, this deference is limited.  The presumption of

---

[76]*Id.*

[77]*National Wildlife Fed'n. v. Coleman*, 529 F.2d 359, 375 (5th Cir. 1976).

[78]16 U.S.C. § 1540(g)(1)(A) and (C).

[79]*Citizens to Preserve Overton Park, Inc.v. Volpe*, 401 U.S. 402, 416 (1971).

[80]*Bennett v. Spear*, 520 U.S. 154 (1997).

[81]5 U.S.C.A. § 706(2)(A).

agency expertise may be rebutted if its decisions are not rational.[82]  A decision is not rational if there is no reasonable connection between the facts found and the choice made.[83]

The APA requires that courts review the entire record or those parts cited by a party. Thus, the court's review is limited to the administrative record that was before the agency decisionmaker.

### 3.    Analysis

Plaintiffs argue that Defendants' no-adverse findings and refusal to engage in formal ESA consultation are arbitrary and capricious and violate the ESA and APA.  They allege that Defendants' findings lack a rational connection to the record and are contrary to the best available science.  Specifically, Plaintiffs allege that Defendants arbitrarily concluded that the GPP would not adversely affect the IBW without: determining whether the IBW inhabits the action area; rationally connecting their no-adverse impact conclusions with the facts regarding potential impacts from water withdrawals; and conducting adequate surveys.  According to Plaintiffs, Defendants' surveys: (1) were arbitrarily limited to forest within one mile of the action area; (2) were arbitrarily limited to areas dominated by trees 12 inches in dbh; (3) arbitrarily excluded areas within 1/8 of a mile of permanent structures, including remote, rarely used hunting cabins; and (4) arbitrarily limited cavity monitoring to only two hours separated by at least one week.  Finally, Plaintiffs allege that Defendants' no-adverse impact conclusion is arbitrary since the there is no firm evidence that an IBW is inhabiting a particular tree.

Defendants contend that Plaintiffs: (1) the agencies were not required to survey the entire action area, because the surveys comply with the final survey criteria based on the best available science; (2) the agencies reasonably incorporated information from surveys conducted by

---

[82]*Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

[83]*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 88 (1983).

Cornell Lab of Ornithology and the Arkansas Highway and Transportation Department; and (3)

the consultation assumed that all suitable habitat within the action area was occupied, and thus,

the impacts to the IBW in the action area were properly evaluated.

### a.     Action Area Surveys

An action area includes all areas that would be affected directly or indirectly by the

action and not merely the immediate area.[84]  The FWS defined the GPP's action area as

> [t]he Grand Prairie Project itself on the Grand Prairie Terrace, the area in the lower
> White River basin potentially affected hydrologically by the project from Interstate
> 40 to approximately St. Charles, Arkansas, as described by the Corps[,] and the lands
> extending one mile from the pipeline . . . .[85]

Much of the GPP area is on prairie terrace,[86] and "currently primarily in agricultural

production with forested areas confined to lands in public ownership or the lowest wettest areas

along streams and drainage."[87]  Thus, most of the project area is "outside the area considered to

be within the potential range of the IBW."[88]

Although the area is characterized as the largest contiguous[89] block of bottomland

hardwood forest in the United States, it is actually broken up by many different features.  For

example, agricultural fields and other forest openings limit the contiguous forest to low and wet

areas and streams.  Also, the basin is covered by several county, state, and federal highways,

---

[84]50 C.F.R. § 402.02.

[85]See Def. Administrative Rec. Vol. 23 at 241.

[86]Prairie terraces were created when glaciers advanced inland, then retreated, creating
much larger rivers.  These larger rivers, fed by melting glacier water, washed out deposits, which
formed terraces that are higher than the modern river floodplains.

[87]See Def. Supplemental Project 493 at 15

[88]*Id.*

[89]Contiguous, defined by *Merriam-Webster's Dictionary,* is touching or connected
throughout in an unbroken sequence.

transmission line rights-of-way, gas pipeline rights-of-way, and waterways.  All these disturbances in the forest create breaks from several feet to 600 feet.  Thus, Defendants are not required to survey these disturbed areas since they are not considered suitable habitat for the IBW.  Accordingly, the agencies properly surveyed potential IBW habitat in the action area.

b.      **Water Withdrawal**

The GPP will withdraw 1.58 billion gallons of water annually from the White River. This is approximately 2% of the 7.36 trillion gallons that flow past the Clarendon Gage.  During times of lower flows -- June through September -- the GPP pumping station has the ability to reduce the White River by up to one foot.  This reduction is projected to be much less during the higher flow months.  Further, Defendants contend that several factors will help mitigate any potential impacts of water withdrawals from the White River.

First, the GPP will reduce the higher-than-normal flows caused by dam operations on the upper part of the White River.  The agencies concluded that this reduced flow would actually benefit the area by producing trees that the IBW prefer.[90]

Second, the GPP will protect against excessive water withdrawals by establishing minimum flows.  In other words, the GPP will not drain the White River below a certain level. Judge Eisele in a previous order regarding the same issue, wrote that "[t]he minimum flow requirements set forth a minimum level of water depth for the White River sufficient to sustain navigation, fisheries, and wetlands,"[91] and he concluded that the minimum flow requirement

---

[90]IBW appear to prefer Nuttall Oak and Sugarberry trees found in drier areas.

[91]*Arkansas Wildlife Fed'n., et al v. U.S. Corp of Engineers, et al.*, No. 4:04CV133-GTE *aff'd* 431 F.3d 1096 (8th Cir. 2005).

would protect the White River and its ecosystem.  This order was affirmed by the Eighth

Circuit.[92]

Finally, data evaluated in the EIS show that the flow of the White River varies more than

2% from year to year due to a variety of factors, and the GPP withdrawals are within the 2%

variable range.  Defendants contend that the AMP is designed to detect any adverse impacts and

prevent any long-term damage.

Plaintiffs rely on the affidavits of Dr. James G. Gosselink and Dr. Jermome Jackson to

support their argument.[93]  Dr. Gosselink found that the Biological Assessment and the FWS's

2005 Concurrence Letter were "seriously deficient and the finding of no adverse effect [was] not

supported by the available evidence."[94]  Dr. Jackson stated that if the "water levels are lowered,

the overall amount of prime habitat for the ivory-bill, the first bottoms, would likely be reduced

and more fragmented."[95]  Although this information is interesting, their opinions are outside the

scope of my review.  The APA permits me to review only the administrative record that was

before the agency decisionmaker,[96] and this information was not in that record.  To consider their

opinions would diminish the agencies' authority, for Congress intended these agencies to handle

these scientific and technical issues, rather than those who are untrained.

Thus, based on the administrative record before me, the agencies reasonably decided that

the impacts of the water withdrawals would not adversely affect the IBW or its habitat.

Additionally, the FWS, aware of the possible effects of water withdrawal, created a monitoring

---

[92]*Id.*

[93]Pl. Ex. Gosselink Decl., Doc. No. 15-7.

[94]Pl. Ex. Jackson Decl., Doc. No. 27-7.

[95]*Id.*

[96]*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).

and AMP as an additional safeguard against unexpected impacts.  The AMP was developed by a number of different agencies and was peer-reviewed.  Since the EIS found that there would be no adverse environmental impact to the White River flood plain, the monitoring plan includes reference sites outside the action area in an effort to analyze the GPP's effect on natural flow variations.

The AMP uses two methods to examine potential impacts to the bottomland hardwood habitat: (1) hydrologic monitoring,[97] which includes flood pulse and flow regime variability monitoring; and (2) bottomland hardwood forest monitoring.

The hydrologic monitoring will provide a base-line for interpreting the biological data from the bottomland hardwood monitoring, as well as a direct measurement of flooding behavior and the dynamics of flood cycles.  Monitoring the bottomland hardwood forest can be used to assess the level and extent of the GPP's impacts to the overall health of the forest.

If any adverse impacts on the bottomland hardwood are detected, as identified by ten triggering mechanisms,[98] the Corps will assess the data and provide a list of recommended actions.  The monitoring plan would detect early signs of any negative impact and any change in

---

[97]Water can move throughout the Earth through different pathways and at different rates. Hydrologic monitoring measures this movement.

[98]The AMP's triggering mechanisms for the bottomland hardwood forests are: (1) changes in forest composition, distribution, and size that result from alteration in hydrologic regime; (2) direct tree mortality associated with changes in hydrologic regime; (3) leading indicators of flooding stress including basal swelling, tip die-back, and leaf chlorosis; (4) changes in herbaceous and shrub density, type, and coverage that are different than would be expected with natural processes; (5) alteration of vegetative regeneration with changes in hydrologic regime; (6) changes in densities of standing snags and down stems; and (7) changes in soil characteristics that are associated with changes in hydrologic regime.

The hydrologic triggers are: (1) changes in flood timing, magnitude, and duration; (2) flow regimes outside the Natural Range of Variation; and (3) long-term changes in flow regimes at gaging stations.

forest conditions towards drier conditions, and could be corrected before large changes in vegetation occur.

Plaintiffs do not believe that the AMP is an effective way to prevent harm to the IBW and assert Defendants arbitrarily based their no-adverse-effect conclusions on mitigating factors that will reduce, but not eliminate, adverse impacts.

Plaintiffs argue that it will take many years to detect unacceptable changes, and that Defendants' claims that they will quickly craft and implement solutions to counter unacceptable changes is unreasonable, unscientific, and arbitrary because of the complexity of the ecosystem. To support their position, Plaintiffs again rely on statements that were not part of the administrative record, and therefore, are outside the scope of my review.  I must rely on the agencies if they have a reasoned, rationale explanation for their decision, and I find here that they have.

### c.      Survey Criteria

Plaintiffs argue that the final survey criteria relied upon by the agencies were inadequate and the FWS arbitrarily changed the search criteria used.  These changes include: (1) changing the 2.5 mile search radius around any construction site to a one-mile search radius; (2) changing the area of focus from areas that were dominated by trees 12 inches in dbh to areas that were dominated by trees 16 inches in dbh; and (3) changing the monitoring of potential IBW cavities from the last two hours of daylight for five days to monitoring potential cavities for the last two hours of daylight for two non-consecutive days separated by at least one week.

Defendants argue that the modified survey criteria that were changed were draft criteria developed only for the GPP.  However, the FWS was responsible for developing the final survey criteria for the species's entire range.

### (i).    Search Radius

Plaintiffs argue that the FWS should have included a greater search radius around any construction site.  Again, when there is a dispute that primarily involves issues of fact and analysis of the relevant information which requires a high level of technical expertise, the courts must defer to the informed discretion of the responsible federal agencies.[99]

The FWS and the Corps argue that they used the best available science and found that the primary concern with construction activities is disturbances within the range of the nest or roost activity.  Tanner's findings showed that the usual distance traveled for foraging during the nesting season is one mile and that longer distances are uncommon.  Although Tanner did observe IBW traveling further, approximately 2.5 miles, from a nest or roost activity during the IBW's non-breeding season, it was an uncommon occurrence.  The FWS concluded that the GPP likely would not adversely affect the IBW because the 2.5 mile range is uncommon for the species.

The FWS concluded that setting the final survey criteria based upon typical distances traveled by the IBW was reasonable.  Further, the FWS considered all the scientific data in reaching its decision.  This is rational, and I must defer to the agency's decision.  They are the experts, and I cannot substitute my judgment for that of the agency.

### (ii).    Tree Diameter

Plaintiffs contend that the final survey criteria arbitrarily focuses on areas dominated by trees 16 inches dbh rather than the 12 inches in dbh used in the draft criteria.

Tanner observed the IBW foraging mostly on trees greater than 12 inches in dbh. However, Cornell expert Martjan Lammertink concluded that foraging is not a limiting factor for the IBW and that the impacts to the cavities are more important.  With that in mind, the final

---

[99]*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989).

survey criteria placed a greater emphasis on the larger trees and determined that areas dominated by trees with 16 inch in dbh or greater would provide proper nesting and roosting opportunities for the IBW.

This decision was based on Tanner's observations about the IBW's nest diameters. Tanner found that the smallest inside diameter for a IBW nest measured seven inches; the FWS concluded that a tree must have a minimum of 11 inches to support such an IBW nest.  Further, the IBW prefer trees that taper, and the FWS found that a tree with 16 inches in dbh would taper to approximately 11 inches at a height of 32 feet.  The IBW nests recorded by Tanner were from 55 feet to 70 feet high in the tree.

Using this information, the FWS determined that changing the survey criteria to 16 inches from 12 inches at dbh was conservative, since some trees have a greater taper.  This is a rational conclusion, and it appears to be supported by the best available data.

### (iii)    Surveys Around Permanent Structures

Plaintiffs argue that some surveys were arbitrarily conducted.  The initial survey excluded areas within 1/8 mile of permanent structures.  FWS later changed this criterion to only exclude areas within 200 feet.  Plaintiffs contend that most of the surveys that were conducted were performed before the change so the surveys are inadequate.  However, the agencies only performed two surveys and none were affected by the change.

The first survey was conducted along the White River where no buildings were present. The second survey was conducted around the pipeline right-of-way where only two residences were nearby, and suitable forest around these residences were surveyed.  The remaining surveys were carried out after the final criteria was released.

Accordingly, the agencies properly surveyed the area around permanent structures.

### (iv).    Cavity Monitoring

Plaintiffs argue that the reduction in monitoring the cavities is arbitrary.  The March 22, 2006 concurrence letter recommended that cavities be physically or electronically observed for the last two hours of daylight for five consecutive days.  This recommendation was not in the final survey criteria.  Observation was changed to physical or electronic monitoring of the cavities for the last two hours of daylight for two non-consecutive days separated by at least one week.

The criterion was changed based on a handwritten suggestion by an unidentified author during a meeting on February 10, 2006.  Although the scope of review is narrow and a court cannot substitute its judgment for that of the agency, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."[100]  However, the court will "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."[101]

The recommendation to break up the cavity monitoring was based on Lammertink's experience studying large woodpeckers worldwide and from three years of IBW searching and monitoring.  The change was also agreed to by a group of experienced biologists from the FWS, academia, state wildlife and resource agencies, and non-governmental organizations.  However, Defendants have failed to provided any facts or explanation for its decision to change this facet of monitoring.

During the 2004-2005 search season, Cornell crews spent 18,300 hours searching nearly 41 kilometers of the Cache River National Wildlife Refuge and Dagmar Wildlife Management

---

[100]*Burling Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

[101]*Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S 281, 286 (1974).

Area.  The Cornell crews discovered 60 cavities suitable for the IBW and spent 900 hours monitoring them.  No IBW was found.

During the 2005-2006 search season, the Cornell crews conducted 446 cavity observations using human surveillance and remote time-lapse video camera observations.  No IBW was found.

Defendants contend that the experience gained from these thousands of hours of monitoring helped support the recommendations to break up the monitoring and reduce the observation time from 5 days straight to observing cavities for two hours of daylight for two non-consecutive days separated by at least one week.

Here, the FWS does not supply a reasoned basis for its decision to reduce the monitoring time nor is the FWS's logic reasonably discerned.  It is unclear why monitoring would be reduced when the IBW was not discovered using the longer monitoring period.  If the Cornell crews, after two non-consecutive days separated by at least one week, discovered the IBW, the agencies' decision would seem reasonably discerned and rational because, based on their experience, they learned that the longer observation period was unnecessary.  However, reducing the observation time, thereby apparently making it less likely to observe the IBW, without explanation, is arbitrary and capricious.  An agency must cogently explain why it has exercised its discretion in a given manner -- the FWS has not met this burden.

Although the change was peer reviewed, the administrative record provides no explanation as to why the change was made other than Lammertink's statement that five days of cavity monitoring was "not good."  Further, Plaintiffs note that the suggestion to make the change was in a handwritten note during a meeting.  The note-maker is not identified and no explanation was made as to why the change was made.

As noted several times above, agencies are given deference in making decisions, but courts still must review those decisions.  Here, the FWS did not adequately explain, in the administrative record,[102] why they changed the cavity monitoring and their decision to do so is not rationally based.

### 4.       Endangered Species Act Conclusion

I find that Defendants' decision to reduce the cavity monitoring is not rationally connected to the administrative record.  Accordingly, Defendants violated the ESA by failing to explain why the monitoring period was changed.

### B.       National Environmental Policy Act

NEPA requires federal agencies to follow certain procedures to examine the environmental impact of their proposed actions.  The purpose of NEPA is to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[103]

NEPA was implemented to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented so that potential negative environmental impacts can be avoided.[104]  While NEPA does not require results, it dictates a process.

---

[102]At the request of the Court, Defendants submitted a letter, but, for one thing, it is not apart of the administrative record, and, for another thing, it does not sufficiently explain why the monitoring was changed.

[103]*Marsh v. Oregon National Res. Council*, 490 U.S. 371 (1989).

[104]*Id.*

NEPA requires preparation of an EIS or a supplemental EIS.  As long as the adverse environmental effects are properly identified and evaluated by the EIS, the agency has complied with NEPA, even if it decides that other values outweigh environmental risks.[105]

If an agency proposes a "major Federal action [that] significantly affect[s] the quality of the human environment," NEPA requires that the agency prepare an EIS that details "the environmental impact of the proposed action."[106]

A July 20, 2006 Order found that the FWS conformed to NEPA directives, and the FWS concluded that the environmental effects on the IBW would not be significant enough to warrant a supplemental EIS in order to comply with NEPA.  Plaintiffs raise the same NEPA claim here, arguing that: (1) the Corps is required to prepare a supplemental EIS because the original EIS is eight years old; (2) the Corps incorporated several changes in the GPP since the EIS; and (3) these factors, combined with the discovery of the IBW, should require the Corp to perform a supplemental EIS.

Defendants contend that the Corps fully analyzed the potential impact of the rediscovery of the IBW, and the GPP will not affect the IBW in a way not already considered before its rediscovery.  Thus, the FWS and the Corps reasonably determined that a supplemental EIS was unnecessary.

### 1.      Age of Environmental Impact Statement

NEPA does not explicitly explain where post-decision supplemental EIS is required, rather, a regulation promulgated by the White House Council on Environmental Quality

---

[105]*Strycker's Bay Neighborhood Council, Inc.*, 444 U.S. at 227-228.

[106]42 U.S.C. § 4332(C).

("CEQ")[107] provides guidance for agencies when determining whether a supplemental EIS is necessary. The regulation requires that agencies

> prepare supplements to either draft or final environmental impact statements if: (1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact.[108]

Once the IBW was discovered, the Corps evaluated the possible impacts to particular areas of the forest considered most suitable to the IBW. An interagency team from the FWS, the Arkansas Game and Fish Commission, and the Corps conducted surveys and examined forest areas that would be disturbed by the canals, pipelines, and the pump station.

During the surveys, they identified the species and age of trees closest to the construction sites and did not find trees typically used by the IBW for nesting, roosting, and foraging. Further, the Corps redesigned the rights-of-way of some pipelines to minimize detrimental effects to mature forest and moved the location of the pump station in order to avoid destruction of old-growth trees.

After the survey, the Corps concluded that there would no significant impact to the IBW because: (1) there were no sightings of the IBW in the project zone; (2) the bottomland hardwoods and wetlands were not seriously threatened by the water withdrawal; and (3) the project would involve destruction of only 135 acres of trees in an area that contains 263,662 acres of forest and wetlands. The FWS agreed with the Corps's conclusion for the most part, but suggested some additional preventative measures.

---

[107]40 C.F.R. § 1502.9(c). The Council on Environmental Quality coordinates federal environmental efforts and works closely with agencies and other White House offices in the development of environmental policies and initiatives. Congress established CEQ within the Executive Office of the President as part of the NEPA.

[108]*Id.*

The FWS conceded that the "stop-pump" provision might not completely offset water reduction and its effects to flood plain resources.  In order to cure this defect, the FWS recommended that a long-term water flow monitoring plan be implemented.  The FWS also requested pre-construction surveys of any trees suitable for the IBW within a one-mile radius. The Corps agreed to these recommendations and both agencies signed on to this condition.

The Corps's conclusion not to prepare a supplemental EIS is given deference since the FWS, the agency with expertise, agreed with the Corps's conclusion that the GPP would not impact the IBW.  Under 50 C.F.R. § 402.14, a federal agency is not required to initiate formal consultation if, as a result of a biological assessment or informal consultation with the FWS, the federal agency determines, with the written concurrence of the FWS Director, that the proposed action is not likely to adversely affect an endangered species or its critical habitat.  Further, the Corps reasonably concluded that rediscovery of the IBW is not significant new information that would require the Corps to prepare a supplemental EIS.

Plaintiffs primary issue of concern with the Corps's decision not to prepare a supplemental EIS surrounds the GPP's potential impact on the IBW's habitat -- the bottomland hardwood forests.  This issue was previously decided, appealed, and affirmed by the Eighth Circuit.  The impacts of the GPP are the same regardless of whether the IBW uses the area or not.

Plaintiffs also argue that, since the EIS is nearly 10 years old, a supplemental EIS is required.  Plaintiffs rely on a CEQ document titled "Forty Most Asked Questions on CEQ NEPA Regulations."[109]  One question asks, "Under what circumstances do old EISs have to be supplemented before taking action on a proposal?"  The answer is:

---

[109]46 Fed. Reg. 18026 (Mar. 23, 1981).

> As a rule of thumb, if the proposal has not yet been implemented or if the EIS concerns an on-going program, EISs that are more than 5 years old should be carefully reexamined . . . . If an agency has made a substantial change in a proposed action that is relevant environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, a supplemental EIS must be prepared . . . .[110]

However, the "Forty Questions" and its answers are not binding on agencies and merely provide "a rule of thumb."[111]

In any event, the Corps has reexamined the 1999 EIS several times. In 2004, the Corps looked at the EIS when new information became available and changes were made to the GPP. The Corps again reconsidered whether a supplemental EIS was necessary after rediscovery of the IBW in May, 2006. Both times, the Corps concluded a supplemental EIS was not necessary.

### 2. Changes to the GPP

Plaintiffs argue that changes in the GPP after the completed EIS require a supplemental EIS. Instead of using canals and preexisting streams, the Corps decided to use pipelines to prevent evaporation. The Corps concluded that these changes would actually reduce the environmental impacts of the GPP. This issue, too, was decided, appealed, and was affirmed by the Eighth Circuit. Further, Plaintiffs' Motion for Temporary Injunction raised the same issue, and I found that the Corps and the FWS did not act arbitrarily or capriciously and did not violate NEPA under the APA standard of review. Here again, I find that the FWS did not act arbitrarily or capriciously when deciding not to complete a supplemental EIS based on the decision to use pipelines.

---

[110]*Id.*

[111]*Id.*

### 3.      Rediscovery of the IBW

Finally, Plaintiffs argue that the rediscovery of the IBW raises significant NEPA issues.

Whether a change or new information is significant enough to require a supplemental EIS

requires consideration of both context and intensity.  Context refers to the setting of the proposed

action while intensity refers to the severity of the impact.

Context and intensity are measured by: (1) the unique characteristics of the area to be

affected; (2) the degree to which the effects are likely to be highly controversial; (3) the degree

to which the effects on the environment are highly uncertain or involve unique or unknown risks;

(4) the degree to which the action may establish a precedent; (5) whether the action is related to

other actions with individually insignificant but cumulatively significant impacts; (6) the degree

to which the action may adversely affect or cause loss or destruction of significant resources; and

(7) the degree to which the action may adversely affect an endangered or threatened species that

has been determined to be critical under the Endangered Species Act of 1973.  According to

Plaintiffs all these of factors are currently present.

The Eighth Circuit has disagreed with Plaintiffs' view and explained that "the record

demonstrates that [Plaintiffs have] overstated the overall impact of the changes on the

environment."[112]  Additionally, the court of appeals found that the determination whether the

changes were significant was one that was best left for the expertise of the Corps.[113]

The EIS reasonably determined it is unlikely that the water withdrawal would adversely

affect bottomland hardwoods.  The monitoring plan was developed to ensure that the bottomland

hardwood forests were protected and any unforeseen harm could be corrected through the

---

[112]*Arkansas Wildlife Federation, et al v. U.S. Corp of Engineers, et al.,* No. 4:04CV133-
GTE *aff'd* 431 F.3d 1096 (8th Cir. 2005).

[113]*Id.*

adaptive management plan.  In fact, the adaptive management plan was designed to address Plaintiffs' concerns about the bottomland hardwood forests.

In view of the deferential standard set out in the APA, Defendants have complied with NEPA directives.  Accordingly, Plaintiffs Motion as to NEPA is DENIED.

### C.    Permanent Injunctive Relief

Plaintiffs seek a permanent injunction to prevent the GPP from proceeding.  They argue that irreparable harm will likely be caused by (1) loss of forest habitat from construction; (2) noise and emissions from construction equipment; (3) water withdrawal; and (4) denial of meaningful public participation opportunities.  Defendants contend that injunctive relief is inappropriate and that the only appropriate remedy is to remand the agency actions challenged in this case.

The Supreme Court has held that "[w]hen an administrative agency has made an error of law, the duty of the Court is to 'correct the error of law committed by that body, and after doing so remand the case to the agency so as to afford it the opportunity of examining the evidence and finding the facts as required by law.'"[114]  In other words, when an administrative error has been identified, a reviewing court "should ordinarily remand the matter to the agency rather than compensate for the agency's oversight by launching a free-wheeling judicial inquiry into the merits."[115]

The Supreme Court has made it clear that a reviewing court may not substitute its judgment for that of agency.  The proper course of action where "the record before the agency

---

[114]*Coteau Properties Co. v. Dep't of Interior*, 53 F.3d 1466, 1482 (8th Cir. 1995).

[115]*Id.*

does not support the relevant agency action is to remand to the agency for investigation and explanation."[116]

## V.    CONCLUSION

For the above stated reasons, Defendants' finding that the GPP will not adversely affect the IBW is VACATED, and the action is REMANDED to correct the deficiencies regarding the monitoring period in the administrative record.

Plaintiffs' Motion for Summary Judgment and Permanent Injunction (Doc. No. 75) is DENIED in part and GRANTED in part.  Plaintiffs' Motion as to NEPA is DENIED.  Plaintiff's Motion as to ESA is GRANTED in part and DENIED in part.

Defendants' Cross Motion for Summary Judgment is DENIED in part and GRANTED in part (Doc. No. 81).  Defendants' Motion as to NEPA is GRANTED.  Defendants' Motion as to ESA is GRANTED in part and DENIED in part.

IT IS SO ORDERED this 8th day of August 2008.

/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[116]*Gonzales v. Thomas*, 547 U.S. 183, 186 (2006)(quoting *INS v. Orlando Venture*, 537 U.S. 12, 18 (2002).